# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

14-CV-4037 (JFB)



KAMAL ABDALLAH,

Petitioner,

VERSUS

UNITED STATES OF AMERICA,

Respondent.

**MEMORANDUM AND ORDER**
November 24, 2015

JOSEPH F. BIANCO, District Judge:

Kamal Abdallah ("petitioner") petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, challenging his conviction entered on March 7, 2011, in the Eastern District of New York for conspiring to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 1349; securities fraud, in violation of 18 U.S.C. § 1348; and wire fraud, in violation of 18 U.S.C. § 1343. Specifically, petitioner argues that (1) his trial counsel was ineffective for failing to file a motion to dismiss for a violation of the Speedy Trial Act, (2) the Court improperly failed to impose a three-level reduction on petitioner's sentence for only partially committing an offense, (3) the Court failed to apportion liability jointly and severally for restitution, and (4) the Court failed to make an individualized inquiry into petitioner's liability. For the reasons set forth below, petitioner's motion is denied in its entirety.

I. BACKGROUND

A. Factual Background

Familiarity with the facts of this case is presumed in light of the Court's earlier opinion regarding this case. *See United States v. Abdallah*, 840 F. Supp. 2d 584 (E.D.N.Y. 2012), *aff'd*, 528 F. App'x 79 (2d Cir. 2013). However, the Court briefly summarizes below the evidence related to the instant motion.

Petitioner was convicted of conspiring to commit securities fraud and wire fraud; securities fraud; and wire fraud. He was sentenced to a term of forty-two months' imprisonment.

Petitioner was the CEO and Chairman of the Board of UPDV, an oil and gas services

1

company. (Tr. 671, 1013–14.)[1] He was also the Chairman of the Board at Continental Fuels, an oil products-related company in which UPDV owned a controlling interest. (Tr. 677–78.) In April 2007, Sheridan Asset Management, LLC ("Sheridan"), a commercial finance and investment management company, lent UPDV about $3.6 million. (Tr. 671–72.) In August 2007, Sheridan extended an additional $3.25 million to UPDV. (Tr. 675–77.) In December 2007, Sheridan lent Continental $5.5 million so that Continental could acquire Geer Tank Trucks, Inc. ("Geer"). (Tr. 677–79.) Also in December 2007, Sheridan extended Continental a $3 million line of credit, which UPDV guaranteed. (Tr. 680.)

In October 2008, UPDV stopped making payments to Sheridan on the $3.6 and $3.25 million loans and went into default on both. (Tr. 684–87.) That month, Continental stopped producing collateral reports to Sheridan. (Tr. 688.) Bank statements for Continental and UPDV show that $4 million was transferred on October 14, 2008, from Geer to Continental, then to UPDV. (Tr. 693–97.) On the same day, $3.5 million was transferred from UPDV to petitioner's personal bank account. (Tr. 699.) Petitioner later acknowledged that he lost $3 million out of the $3.5 million that was transferred to his account by engaging in currency trading. (Tr. 699–700.) Because of petitioner's actions, Geer was unable to pay its suppliers and began to bounce checks. (Tr. 701–02.)

On October 27, 2008, petitioner asked UPDV's transfer agent to issue 600 million UPDV shares in the name of Mohamed Abdellatif Yassine, with the stock certificates sent overseas to Al Mawarid Financial Services in Beirut, Lebanon. (Tr. 304-05; Gov't Ex. 98.)[2] The stock certificates were issued and sent overseas as requested. (Gov't Ex. 98.)

In December 2008, petitioner resigned from UPDV, Continental, and all related companies. At that point, UPDV owed Sheridan more than $14 million. (Tr. 704–06.)

On June 1, 2009, petitioner and an associate, Robert Kainth, began buying and selling millions of UPDV shares between them in order to artificially increase the trading volume of the stock. (Tr. 877-882; Gov't Exs. 213, 214.)

On June 18, 2009, petitioner first spoke to Eric Seiden, who told petitioner that he had a lot of relationships with people and could buy a lot of stock. (Tr. 394-95; 398-99.) Petitioner agreed to wire Seiden money if Seiden successfully procured buy orders for UPDV shares and to pay Seiden 25 percent of the purchase price of any of the UPDV shares that Seiden bought. *Id.* That same day, Seiden bought a few million UPDV shares, and petitioner wired him $3,500. *Id.*

After June 18, 2009, Seiden continued to place buy orders in UPDV stock on the petitioner's behalf by calling brokerage firms pretending to be various individuals from institutional investors who had existing accounts at the brokerage firms. (Tr. 407-08.) During these phone calls, Seiden would place buy orders into the accounts of the investors that he was impersonating. Seiden placed fake buy orders on June 22, June 25, June 26, July 7, and July 8, 2009, at brokerage firms such as Cantor Fitzgerald, Dinosaur Securities, Roth Capital Partners, and Royal Bank of Canada Capital Markets. (Tr. 41–43, 70–74, 119–125, 134–35, 155–56.)

---

[1] Tr. refers to the trial transcript for *United States v. Abdallah*, 1:09-cr-00717-JFB.

[2] Gov't Ex. refers to an exhibit introduced by the government at trial.

2

Between June 19 and July 10, 2009, petitioner and Seiden communicated several times per day by phone and through text messages. (Tr. 404-05.) In these communications, petitioner told Seiden how many shares to buy, the price that UPDV shares were selling for at the time, and the price at which petitioner wanted to sell the shares, which was "always above where the market was trading." (Tr. 405, 407, 411.)

On days that Seiden successfully placed a fake buy order, petitioner sold or attempted to sell UPDV stock. (Gov't Ex. 216.) He also made multiple phone calls or sent text messages on those days and wired money to Seiden on or around the days when he placed the buy orders. (Gov't Ex. 211; Tr. 287–88, 425–28, 431.)

On July 15, 2009, Seiden flew to San Antonio, Texas, where petitioner resided, to meet with him at petitioner's expense. (Tr. 436-37, 441, 998-99.) During the visit, the two discussed putting in buy orders for UPDV and another company in which petitioner owned shares, Alphatrade. (Tr. 442-43, 445.) Seiden also told petitioner his particular fraudulent technique for securing the buy orders – informing brokerage firms that he had accounts there, when in fact he did not. (Tr. 446.) Seiden explained that some buy orders failed because the firms figured out that he did not have an account and refused to place the buy order. *Id.*

On July 16, 2009, petitioner asked Seiden to buy more stock for him and agreed to provide Seiden with additional names, when Seiden said he was running out of firms to call. (Tr. 448.)

Both before and after Seiden's trip to Texas on July 15, 2009, petitioner bought Alphatrade shares in his personal brokerage account, including the following: (a) on July 14, 2009, petitioner bought 420,000 Alphatrade shares at a cost of $11,385; and (b) on July 16, 2009, petitioner bought another 50,000 shares of Alphatrade in his brokerage account at a cost of $1,555. (Tr. 903; Gov't Ex. 36.).

The FBI arrested Seiden on July 21, 2009. (Tr. 448.) On July 21, July 28,[3] and July 31, 2009, Seiden made consensually recorded phone calls to petitioner, in which petitioner requested that Seiden continue placing fake buy orders for UPDV. (Gov't Exs. 4, 5, 6.) In the July 21, 2009 call, petitioner told Seiden to buy 25 to 50 million shares of UPDV every other day and to try to raise the price of UPDV, and in exchange, offered to provide a kickback to Seiden of 25 percent of whatever shares they were able to sell. (Gov't Ex. 4.)

In the July 28, 2009 call, during which Seiden told the petitioner that he was "still in New York," petitioner told Seiden to put in buy orders for UPDV at up to $0.0045 per share, even though UPDV was trading between $0.0024 and $0.0028 per share. *Id.* The petitioner again mentioned that he would pay Seiden a kickback of 25 percent on all shares that were sold. *Id.*

In calls on July 31, 2009, the petitioner and Seiden again discussed the UPDV buy orders. (Gov't Ex. 6-9.) Seiden said "you know how I'm doing it" and agreed that if the brokerage firms realized how Seiden was buying the stock, petitioner would not tell them that he knew Seiden. (Gov't Ex. 6.) Seiden told petitioner that he had to be "cautious because of what I do." (Gov't Ex.

---

[3] Seiden was located in the Eastern District of New York when he made the July 28, 2009 phone call. (Gov't Ex. 5.)

3

8.) Seiden explained that he was talking "outta my, my butt when I tell them who I am and everything," and that he had to "pretend who I am." (Gov't Ex. 2, 3.)

In the two weeks or so after the July 31, 2009 phone calls, petitioner sent multiple text messages to Seiden imploring him to contact him so they could keep working together. (Tr. 214, 215, 219, 221; Gov't Ex. 10.)

B. Procedural History

A warrant for petitioner's arrest, charging him with conspiracy to violate Title 18 of the United States Code by scheming to defraud in connection with the purchase and sale of securities, was issued on August 7, 2009 in the Eastern District of New York. (*See* Warrant for Arrest, *United States v. Abdallah*, 1:09-cr-717-JFB, ECF No. 2.) Petitioner was arrested in the Western District of Texas on August 11, 2009, and he appeared in court there on the day of arrest and was made aware of the charges he faced. (Ex. A to Gov't Mem., ECF No. 21.) Petitioner originally requested a preliminary hearing and identity hearing but on August 20, 2009, he waived both hearings and agreed to pay bail so that he could travel on his own to the Eastern District of New York and resume court proceedings on August 27, 2009. (Ex. C to Gov't Mem.)

However, petitioner did not appear in the Eastern District of New York until a week past that scheduled date, on September 4, 2009. (*See* Initial Appearance, *United States v. Abdallah*, 1:09-cr-717-JFB, ECF No. 5.) The record does not illuminate the cause of petitioner's absence. When petitioner appeared before Magistrate Judge Carter, he consented to the exclusion of thirty-five days from the speedy trial clock, from September 4, 2009, until October 9, 2009. (Order of Excludable Delay, *United States v. Abdallah*, 1:09-cr-717-JFB, ECF No. 7.) Eleven days after the excluded period ended, on October 20, 2009, a grand jury returned an indictment against petitioner, charging him with conspiracy to commit securities fraud under 18 U.S.C. §1349, and substantive securities and wire fraud under 18 U.S.C. § 1343 and 18 U.S.C. § 1348. (Indictment, *United States v. Abdallah*, 1:09-cr-717-JFB, ECF No. 8.)

At trial, petitioner testified on his own behalf. (Tr. 998–1383.) During that testimony, he testified in detail as to the circumstances that led to his transactions with Seiden and denied any knowledge that Seiden was fraudulently inflating the price of stocks. *Id.*

On March 7, 2011, petitioner was convicted by a jury on counts one, two and seven from the original indictment, constituting conspiracy to commit securities fraud and wire fraud, securities fraud, and wire fraud, respectively.[4]

During sentencing, petitioner argued, as he had at trial, that he was unaware of the fraud that Eric Seiden was committing between June 22 and July 8. (Ts. at 12-13.)[5] However, the Court found that the evidence brought forth at trial overwhelmingly proved petitioner's knowledge that a fraudulent scheme was occurring, in which Seiden would place fake stock orders at an inflated price, and petitioner would then dump his stock at that increased value. *Id.* at 13-18. The Court calculated the loss amount from the fraud to be $509,072.18, including $224,072.18 in actual loss to brokerage houses as a result of the scheme, and an additional $285,000.00 of loss that would have resulted had Eric Seiden followed

---

[4] Counts 3-6 were dropped by the prosecution prior to the trial. (Gov't Mem. at 2.)

[5] Ts. refers to the transcript from the sentencing hearing

4

petitioner's instructions to continue the fraudulent scheme. *Id.* at 17-18. The Court also imposed a two-level sentence enhancement for the obstruction of justice because petitioner perjured himself at trial by denying knowledge of Seiden's fraudulent actions. *Id.* at 23-28. The Guidelines placed the sentencing range at 51 to 63 months; however, the Court found that petitioner's generosity and family values and the fact that Seiden concocted the fraudulent scheme were mitigating factors calling for a lower sentence. *Id.* at 29, 37, 46-49. Petitioner was ultimately sentenced below the Guidelines, to 42 months' incarceration, and ordered to pay the full loss amount of $224,072.18 in restitution to the defrauded brokerage houses. *Id.* at 43, 52-53.

On July 1, 2011, petitioner moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Civil Procedure and a new trial pursuant to Rule 33(a). *See Abdallah*, 840 F. Supp. 2d at 584. Petitioner's motion was based on seven allegations of error, all of which were ultimately rejected by the Court. Petitioner first alleged that the Eastern District of New York did not have venue, but the Court found that petitioner's call to a co-conspirator in the Eastern District of New York was enough to establish venue as to each count; further, the Court rejected the argument for manufactured venue as to each count. *Id.* at 601-08. The Court also found that the evidence brought forth at trial satisfied each element of wire fraud and, thus, was sufficient to convict the petitioner of wire fraud. *Id.* at 608-10. Next, the Court determined that the motion for a new trial was without merit because (1) there was no constructive amendment of the original indictment, nor was there prejudicial variance to the superseding indictment; (2) no *Brady* violation had occurred because the government did not withhold any relevant notes and disclosed two FBI reports concerning Seiden's past contacts in connection with fraud to petitioner before trial; (3) evidence of petitioner's misappropriation of stock and failure to disclose material information to shareholders was properly admitted in order to rebut statements made by petitioner during his direct testimony and to show motive, fraudulent intent, and knowledge; and (4) the prosecutor did not substantially prejudice petitioner's case in its summation. *Id.* at 611-624.

On January 13, 2012, petitioner filed a notice of appeal from the judgment with the Second Circuit. *United States v. Abdallah*, 528 F. App'x 79 (2d Cir. 2013). On appeal, petitioner only alleged that venue in the Eastern District of New York was improper for all counts of the indictment and that the indictment was constructively amended at trial. *Id.* at 80-83. The Second Circuit rejected both of petitioner's arguments and affirmed the denial of petitioner's motion for a judgment of acquittal and a new trial. *Id.* at 84.

Petitioner now moves to have his sentence vacated pursuant to 28 U.S.C. § 2255. Petitioner alleges that (1) his trial counsel was ineffective for failing to file a motion to dismiss the case under the Speedy Trial Act when more than thirty days had passed between arrest and indictment; (2) the Court failed to impose a mandatory three-level sentencing reduction under 18 U.S.C. § 2X1.1(a); (3) the Court should have imposed joint and several liability on petitioner and Seiden (rather than full liability on petitioner); and (4) the Court failed to make an individualized finding of petitioner's liability before issuing his sentence. Petitioner also requests an evidentiary hearing regarding his claims.

5

## II. STANDARD OF REVIEW

### A. Section 2255 Petition

Pursuant to 28 U.S.C. § 2255, a prisoner sentenced in federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" when the petitioner claims "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). If a claim that petitioner raises in a § 2255 motion has not been previously raised on direct appeal, generally, the claim is procedurally barred unless the petitioner can show cause and prejudice or actual innocence. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *Rosario v. United States*, 164 F.3d 729, 732 (2d Cir. 1998). However, this bar does not apply to claims of ineffective assistance of counsel; the Supreme Court has stated that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Massaro*, 538 U.S. at 504.

With respect to the issue of an evidentiary hearing, § 2255 states that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). Rule 4(b) of the Rules Governing Section 2255 Proceedings also provides that "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion. . . ." Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b), 28 U.S.C. foll. § 2255. On this issue, the Second Circuit has made clear that "[t]o warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that 'he will necessarily succeed on the claim.'" *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (quoting *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000)). The Second Circuit has set forth detailed guidance on how a district court should determine whether a hearing is necessary. *See id.* at 213–15. In particular, the Court noted that, given the absence of pre-motion discovery in a § 2255 case, "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases or seek a discovery order from the court under Rule 6 of the Rules Governing Section 2255 Proceedings." *Id.* at 213–14.

In the instant case, applying the above referenced standard, this Court determines that no evidentiary hearing is warranted because petitioner's motion and the record in this case conclusively demonstrate that he is entitled to no relief under § 2255. With respect to the ineffective assistance of counsel claim for failure to move to dismiss for a violation of the Speedy Trial Act, petitioner has identified no documents outside the record that could aid the court in making a determination on this claim. As is discussed below, the record clearly indicates that no violation of the Speedy Trial Act took place; thus, petitioner's argument fails to meet *Puglisi*'s plausibility standard. With respect to the three sentencing claims, petitioner again fails to point to any evidence related to these claims that exists outside the record as it stands today. The trial record and pre-sentencing report contain all evidence relevant to petitioner's scope of liability in the crimes of conviction. As was reflected at

6

sentencing, that evidence was more than sufficient to deny a reduction under 18 U.S.C. § 2X.1 and apportion full liability to petitioner. Thus, an evidentiary hearing on any of petitioner's claims is unwarranted pursuant to Rule 4(b).

B. Ineffective Assistance of Counsel

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: that (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *DeLuca v. Lord*, 77 F.3d 578, 588, 588 n.3 (2d Cir. 1996) (quoting *Strickland*, 466 U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91). When the underlying claim petitioner complains of in a § 2255 motion is "meritless," counsel cannot be found ineffective for failing to raise it. *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they "'undermine[ ] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'" *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first

7

prong of *Strickland*, the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

This Court proceeds to examine petitioner's claims, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

III. DISCUSSION

Petitioner moves to have his sentence vacated on four grounds. First, petitioner claims that his trial counsel was ineffective for failing to file a motion to dismiss the case under the Speedy Trial Act when more than thirty days had passed between arrest and indictment. Second, petitioner argues that the Court failed to impose a three-level sentencing reduction under 18 U.S.C. § 2X1.1(a) for only partially committing the offense. Third, petitioner alleges that the Court should have imposed joint and several liability on himself and Seiden for restitution purposes, rather than full liability on petitioner. Finally, petitioner claims that the Court failed to make an individualized inquiry into his liability before imposing his sentence.

As set forth below, the Court concludes that petitioner's claim of ineffective assistance of counsel is without merit because a motion to dismiss for violation of the Speedy Trial Act would have been unsuccessful, and the underlying circumstances suggest that any dismissal would have been without prejudice. The Court further concludes that petitioner's sentencing claims are without merit. Initially, because these claims were not raised on direct appeal, they are procedurally barred.

Assuming *arguendo* that these claims are reviewable, they fail on the merits. Petitioner is not entitled to a reduction under 18 U.S.C. § 2X1.1(a) because the circumstances demonstrate that he was about to complete all acts necessary for completion of the crime but for Seiden's cooperation with the government. The Court did not err in failing to impose joint and several liability between petitioner and Seiden because a court may not apportion liability on a co-conspirator who is not charged as a defendant in the same case. The Court properly apportioned liability in finding petitioner liable for the fraud's entire resultant loss because a defendant may be held liable for actions of others in jointly undertaken criminal activity so long as the acts were within the scope of the agreement and could be reasonably foreseen by the defendant.

A. Speedy Trial Act Violation

Petitioner argues that his counsel was ineffective for failing to file a motion to dismiss for violations of the Speedy Trial Act. (Pet'r's Mem. at 2-6, ECF No. 1.) However, as set forth below, this argument is without merit. Trial counsel's failure to file a motion to dismiss for a Speedy Trial Act violation does not constitute ineffective assistance of counsel because the motion would have been meritless, and the underlying circumstances suggest that any dismissal would have been without prejudice.

Chapter Eighteen of the United States Code makes clear that, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). Here, seventy days expired between the arrest and indictment; petitioner was arrested on August 11, 2009,

8

and was indicted on October 20, 2009. However, there are numerous justifications for the exclusion of time between those events. Only if the non-excluded time between arrest and indictment exceeds thirty days is there an actual violation of the Speedy Trial Act. *See* 18 U.S.C. § 3161(h).

One ground for exclusion exists when the court finds the ends of justice served by excluding time from the speedy trial clock exceed the interest of the defendant and the public in having a speedy trial. 18 U.S.C. § 3161(h)(7)(A). As long as the court's reasons for granting the delay are stated on the record, are reasonable pursuant to 18 U.S.C. §§ 3161(h)(7)(B)(i) - (iv), and are not due to the mere congestion of the court calendar, 18 U.S.C. § 3161(h)(7)(C), then that time is not counted towards the speedy trial clock. There is no dispute in this case that at his August 27, 2009 appearance, petitioner consented to the exclusion of thirty-five days from the speedy trial clock (from September 4, 2009 to October 9, 2009) in order to engage in plea negotiations, which is a permissible and reasonable reason for delay. (*See* Application & Order of Excludable Delay, ECF No. 7, *United States v. Abdallah*, 1:09-cr-717 (JFB).) Thus, out of the seventy days that expired, that leaves thirty-five days remaining.

An additional ground for exclusion exists for "[d]elay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure" and, thus, such time should not be counted towards the thirty-day period. 18 U.S.C. § 3161(h)(1)(E). One such example of this exclusion occurs when the defendant is arrested in a district other than the one that issued the warrant for his arrest. In such an instance, the time between defendant's initial appearance in the district of arrest and defendant's initial appearance in the district in which defendant is ultimately charged is excluded from the speedy trial clock so long as the delay is reasonable. *See United States v. Hernandez*, 863 F.2d 239, 243-44 (2d Cir. 1988) (finding fourteen day delay between defendant's arrest in Nevada and his initial appearance in Vermont after he was released on bail excludable from the speedy trial clock); *United States v. Edgecomb*, 910 F.2d 1309, 1314-15 (6th Cir. 1990) (excluding thirty-two days between defendant's arrest in Florida and initial appearance in Ohio, where the arrest warrant originated). Here, petitioner was arrested in Texas on a warrant that was issued in the Eastern District of New York and, thus, required relocation to the district where his charge originated. After his last court appearance in Texas, on August 20, 2009, defendant was released on bail with instructions to appear in court in New York seven days later, on August 27. (*See* Ex. C to Gov't Mem.) Seven days certainly falls into the category of reasonable delay for defendant's removal to the district of charging pursuant to 18 U.S.C. § 3161(h)(1)(E). *See Hernandez*, 863 F.2d 243; *Edgecomb*, 910 F.2d 1314-15. Accordingly, these seven days should be excluded from the speedy trial clock, bringing the time elapsed between arrest and indictment to twenty-eight days, consistent with the Speedy Trial Act.[6]

Even if the Speedy Trial Act's time limits are exceeded, a petitioner cannot bring forth a successful ineffective assistance of counsel claim unless he can show that counsel's failure to move to dismiss on those grounds prejudiced the case. *See Strickland*, 466 U.S. at 694. In other words, if the court would have dismissed the case without prejudice

---

[6] The Court notes that petitioner did not appear in the Eastern District of New York until September 7, 2009, a week after his scheduled appearance. However, the record does not illuminate the cause of the delay.

9

upon counsel's motion to dismiss for violation of the Speedy Trial Act, then a petitioner's sentence cannot be vacated under § 2255. *Id.* The determination of whether to dismiss a case with or without prejudice is up to the discretion of the district court and will only be overturned upon a finding of abuse of discretion. *United States v. Wilson*, 11 F.3d 346, 352 (2d Cir. 1993). The factors that the district court must consider when deciding whether to dismiss a case with or without prejudice due to a Speedy Trial Act violation are (1) the seriousness of the offense, (2) the facts and circumstances of case leading to dismissal, and (3) the impact that reprosecution would have on the administration of the Speedy Trial Act and justice. 18 U.S.C. § 3162(a)(2); *see Wells*, 893 F.2d at 538-40 (reversing lower court's dismissal with prejudice because underlying crime of impersonating an officer was serious, defendant's failure to appear at his preliminary examination was inexcusable and likely contributed to delay, and the burden was on the defendant to disclose his whereabouts in his absence); *Hernandez*, 863 F.2d at 243-44 (finding an isolated violation of the Speedy Trial Act, where offense was serious, delay was short and there was no evidence of bad faith or a pattern of neglect, did not warrant dismissal with prejudice); *United States v. Giambrone*, 920 F.2d 176, 180-82 (2d Cir. 1990) (affirming dismissal with prejudice because government delayed trial for months against defendant's opposition, displaying lack of concern with the Speedy Trial Act).

Accordingly, assuming *arguendo* that there was a violation of the Speedy Trial Act that warranted dismissal, this Court would not have dismissed the case with prejudice. Petitioner's crimes of conviction, substantive securities fraud and wire fraud as well as conspiracy to commit securities and wire fraud, are serious offenses. Furthermore, the underlying circumstances leading up to a potential dismissal show no lackadaisical attitude towards the Speedy Trial Act that can be attributed to the prosecution, such that dismissal with prejudice is warranted in order to send a message to the prosecutor's office.

Because trial counsel's conduct did not fall below an objective level of diligence for failure to file a motion to dismiss upon a meritless Speedy Trial Act claim, and there is no probability that the case would have arrived at a different outcome had counsel made that motion (even assuming that the motion was meritorious), petitioner's claim of ineffective assistance of counsel must fail.

B. Sentencing Claims

1. Procedural Bar

Failure to raise an issue on direct appeal generally bars that issue from being heard on a § 2255 motion. *Zhang v. United States*, 506 F.3d 162, 167 (2d Cir. 2007). Because petitioner failed to allege on direct appeal that (1) the court should have imposed a reduction on his sentence, (2) the court should have imposed joint and several liability, and (3) the court should have made a more individualized finding of petitioner's liability, these claims are procedurally barred.[7]

---

[7] Even if the court were to generously construe petitioner's *pro se* motion to consider these arguments as ineffective appellate counsel claims, thus, bringing them past the procedural bar, the claims would fail due to their lack of merit because petitioner could not be prejudiced by counsel's failure to bring forth meritless claims on appeal.

With respect to claims of ineffective assistance of appellate counsel, a criminal defendant has the right to the effective assistance of counsel on the direct appeal of his conviction. *See Evitts v. Lucey*, 469 U.S. 387, 397 (1985). In determining whether appellate counsel has rendered constitutionally effective assistance, courts apply the same standard established in

Assuming *arguendo* that these claims are reviewable, they are without merit, as set forth below.

2. Merits Analysis

a. Three-Point Reduction

Section 2X1.1(b)(1) of the United States Sentencing Guidelines provides that if a substantive crime is merely attempted, rather than completed, the court must decrease the base level of the offense by three *unless* (1) "the defendant completed all the acts he believed necessary for successful completion of the substantive offense" or (2) "the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." U.S.S.G. § 2X1.1b(2); *see United States v. Medina*, 74 F.3d 413, 418 (2d Cir. 1996). Whether the reduction is granted depends solely on the conduct of the defendant, not whether the intervention of government agents made it unlikely to succeed – many preexisting circumstances doom a conspiracy without making the defendants any less culpable. *Medina*, 74 F.3d at 418. If an individual was about to complete a crime, he is not entitled to a sentencing reduction, even if the government had been monitoring the defendant and, therefore, was sure to apprehend the defendant before the crime was completed. *Id.* In *Medina*, the Court declined to reduce the base level of defendant's arrest for armed robbery of an office building because the defendant had obtained weapons, planned the date of the robbery, possessed blueprints of the office, arrived at the building with getaway car, and approached the building with masks; thus, the defendant would have completed the crime but for police intervention. *Id.* at 419; *see also Hernandez v. United States*, No. 02 CV. 1663 (JGK), 2003 WL 223467, at *6 (S.D.N.Y. Jan. 31, 2003) (declining to issue sentencing reduction when defendant was arrested, money in hand, when about to purchase cocaine from undercover informant, because circumstances indicated that illegal sale would have been completed but for police intervention).

Petitioner alleges that because the final fraudulent transaction, in which he planned to defraud a brokerage firm out of $285,000 via the same scheme he had been already using to defraud brokerage firms, ultimately did not go through due to Seiden's cooperation with the government, he is entitled to the reduction for partially completed offenses. (Pet'r Mem. at 9.) However, petitioner finds himself in the same circumstances as the defendants in

---

*Strickland* for analyzing such claims as to trial counsel. *See, e.g., Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). As noted *supra*, under the Strickland standard, a petitioner alleging ineffective assistance of appellate counsel must prove both: (1) that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) that absent counsel's deficient performance, there was a reasonable probability that the defendant's appeal would have been successful. *See Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001); *Mayo*, 13 F.3d at 533.

Appellate counsel "need not (and should not) raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745, 750–54 (1983)). As the Supreme Court has noted, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751–52).

Each of petitioner's claims regarding sentencing are without merit for the reasons set forth below in section III.B.2. Because petitioner's § 2255 claims are meritless, appellate counsel did not fall below an objective standard of reasonableness in failing to raise those same claims on appeal. Because petitioner cannot prove this first prong of the *Strickland* standard, an ineffective assistance of appellate counsel claim would fail.

*Medina* and *Hernandez*. Petitioner had already taken each of the steps he had previously taken when defrauding brokerage firms with Seiden – petitioner had an inflated stock price in mind and contacted his co-conspirator to place a fake buy order for petitioner's stock so that he could sell it at an inflated price. (*See* Gov't Exs. 4-9.) Thus, the substantive crime would have been completed but for the government's intervention. Accordingly, petitioner is not entitled to a reduction under U.S.S.G. § 2X1.1(b).

### b. Apportionment of Liability

Petitioner argues that the Court should have ordered his co-conspirator and him jointly and severally liable for restitution, rather than finding petitioner liable in full. (Pet'r Mem. at 10-11.) Under 18 U.S.C. § 3664(h), "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." However, joint and several liability may be imposed only when a single district judge is dealing with multiple defendants in a single case. A judge may not apportion liability among individuals "not charged in the indictment or tried with [the] defendant." *United States v. Lucien*, 347 F.3d 45, 54 (2d Cir. 2003) (finding that district court could not make defendant's restitution obligation joint and several with uncharged entities upon whom court then lacked "authority" to impose restitution order, despite the fact that those out-of-court entities were benefactors of defendant's health care fraud); *United States v. Aumais*, 656 F.3d 147, 156 (2d Cir. 2011) (Section 3664(h) "implies that joint and several liability may be imposed only when a single district judge is dealing with multiple defendants in a single case (or indictment)").

The record from the sentencing hearing makes clear that the evidence elicited at trial sufficiently proved that petitioner was fully aware of his co-conspirators' fraudulent actions from the start of their collaboration. (*See* Ts. at 10, 14, 16-18.) Accordingly, the Court had justification for apportioning full liability to petitioner. Further, the court could not have imposed joint and several liability on petitioner and his co-conspirator in any event because Seiden was convicted in a separate case and sentenced by a different judge.

The second apportionment claim petitioner makes is that the Court erred in finding him liable for the fraud's entire resultant loss. (Pet'r Mem. at 11-13.) Petitioner argues that the Court erred in attributing conduct to him that took place before he joined the conspiracy. *Id.* The Court disagrees.

When a court finds that a defendant has participated in jointly undertaken criminal activity, it may hold one defendant liable for the actions of another as long as two specific findings are made: (1) that the acts were within the scope of the defendant's agreement, and (2) that they were foreseeable to the defendant. *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004); *see also United States v. Eisner*, 431 F. App'x 23, 26-27 (2d Cir. 2011) (holding one defendant fully liable for the losses attributed to his Ponzi scheme because he continued to participate in and profit from it). This inquiry into the scope of what a defendant actually agreed to undertake and the specific conduct and objectives embraced by the defendant's agreement can be based upon either explicit agreements or implicit agreements inferred

12

from conduct. *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995).

As previously discussed, the sentencing record clearly states the grounds for finding petitioner fully liable for restitution. The Court determined that even if petitioner did not know exactly how Seiden was defrauding brokerage houses, he clearly understood that fraudulent means were being used since the beginning of their cooperation. (*See* Ts. at 16-18.) Accordingly, the fact that others would lose money if petitioner sold his stock at a falsely inflated price was foreseeable to him. *Id.* Moreover, the record demonstrates that petitioner played a significant role in the scheme's development and execution as just one of two moving parts in the fraud, supporting a finding of foreseeability of the extent of the resultant loss and demonstrating that the scope of petitioner's agreement with Seiden encompassed those losses. Because the record demonstrates that both prongs of 18 U.S.C. § 3664(h) are satisfied, petitioner can be held liable for the losses Seiden caused in connection with their scheme in addition to the losses he, himself, caused.

Because finding petitioner jointly and severally liable for restitution would have been improper, and the sentencing transcript demonstrates individualized findings pertaining to the scope of petitioner's agreement with his co-conspirator and the foreseeability of the full losses caused by the scheme to defraud, both of petitioner's claims related to the imposition of full liability must fail on the merits.

IV. CONCLUSION

For the foregoing reasons, the court finds that petitioner has demonstrated no basis for relief under 28 U.S.C. § 2255. Therefore, the petition for a writ of habeas corpus is denied.

SO ORDERED.
s/ Joseph F. Bianco

JOSEPH F. BIANCO
United States District Judge

Dated: November 24, 2015
Central Islip, New York

\*\*\*

Petitioner is proceeding *pro se*. Respondent is represented by Robert L. Capers, United States Attorney, Eastern District of New York, by Justin David Lerer and Tyler Joseph Smith, 271 Cadman Plaza East, Brooklyn, NY 11201.

13